UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|   |   |
|---|---|
| MAXIMILIANO FRANCO; BAUDILIO NAVARRO; and WALTER SALAZAR, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) C.A. No. 16-225 WES ) |
| ROMAN'S COMMERCIAL CLEANING AND PROPERTY MAINTENANCE, INC.; EAGLE JANITORIAL SERVICES CORP.; ROMAN DROZDOWSKI; LUCIANO A. DESOUZA; and DAVI DESOUZA (a.k.a. DAVID SOUZA or DAVID DESOUZA), | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

Before the Court is Defendants' Roman's Commercial Cleaning and Property Maintenance, Inc. ("Roman's"), and Roman Drozdowski ("Drozdowski") (collectively "Defendants")[1] Motion for Summary Judgment ("Motion") (ECF No. 42). Plaintiffs Maximiliano Franco ("Franco"), Baudilio Navarro ("Navarro"), and Walter Salazar ("Salazar") (collectively "Plaintiffs") assert claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and

---

[1] On September 29, 2016, the Clerk of Court entered default against Defendants Eagle Janitorial Services Corp. ("Eagle"), Luciano DeSouza, and Davi DeSouza (a.k.a. David Souza or David DeSouza) ("Davi Souza"). Since that time, however, Plaintiffs have taken no further steps to obtain default judgment against these defendants.

the Rhode Island Minimum Wage Act ("RIMWA"), R.I. Gen. Laws § 28-12-1, et seq., for Defendants' failure to pay Plaintiffs minimum wage and overtime pay. (See generally Compl., ECF No. 1.) Defendants' Motion concerns whether Roman's constitutes a "joint employer" for purposes of Plaintiffs' action. (See Defs.' Mem. of L. in Supp. of its Mot. for Summ. J. ("Defs.' Mem.") 2–3, ECF No. 42-1.) For the reasons set forth below, the answer is no, and Defendants' Motion is therefore GRANTED.

I. Background[2]

Roman's, owned by Defendant Drozdowski, is a cleaning company in West Warwick, Rhode Island, which has been in the commercial cleaning business for approximately thirty years. (Drozdowski Dep. 9:8–9, 15:3–7, 14–16, 16:9–14, 15–22, 17:5–14, 23:23–24:2, ECF No. 42-12.) Roman contracts with customers to clean commercial properties. (Id. at 21:9–17.) Rather than clean its customers' properties itself, however, Roman's subcontracts the cleaning work out to other cleaning companies. (Id. at 21:17–19.) Roman's, meanwhile, employs only a small office staff and two supervisors, Andrzej Skura and Marian Boda, who liaise with the subcontractors.

---

[2] The Court recounts the facts in the light most favorable to, and drawing all inferences for, Plaintiffs, as the nonmovants. See Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 396 (1st Cir. 2012).

(Id. at 21:20–22:13, 30:4–31:8; Boda Dep. 6:11–15, ECF No. 42-9; Skura Dep. 8:19–9:1, ECF No. 42-10.)

Eagle was one such cleaning company to which Roman's farmed out cleaning work. (Drozdowski Dep. 66:3–6.) Eagle, incorporated in July 2015,[3] was located in Revere, Massachusetts, and owned by Davi Souza. (See Company Resume & Portfolio 1, ECF No. 42-3; Business Entity Summ. 1, ECF No. 43-8.) Eagle contracted with Roman's to clean Stop & Shop stores in Bristol and Middletown, Rhode Island; Savers stores in Woonsocket, Rhode Island, and in Saugus, Danvers, and Framingham, Massachusetts; and Not Your Average Joe's restaurants in Waltham, Acton, and Westboro, Massachusetts. (Master Cleaning Services Agreement ¶¶ 1–2(A), ECF No. 42-4; Statement of Services 1, ECF No. 42-5.) The contract directed that Roman's pay Eagle for cleaning services at set rates, usually weekly. (Master Cleaning Services Agreement ¶ 3(B); Statement of Services 1.)

Davi Souza hired Plaintiffs to clean some of the stores that Eagle contracted to clean for Roman's. (See, e.g., Franco, Navarro, Salazar Deps. ("Pls.' Deps.") 7:16–8:1, 10:13–14, 22:5–6, ECF No. 42-11; see also Pls.' Statement of Disputed Facts ("Pls.' SDF") ¶ 7, ECF No. 43-1.) Franco and Navarro aver that

---

[3] Though, when applying to be a subcontractor for Roman's, Davi Souza represented that Eagle had been in the cleaning business for eight years. (Company Resume & Portfolio 1.)

3

they each "worked as a Cleaner at the Stop & Shop grocery store in Bristol and Newport, Rhode Island from August 2015 until December 24, 2015." (Franco Aff. ¶ 3, ECF No. 43-7; Navarro Aff. ¶ 3, ECF No. 43-7.) Salazar states that he "worked as a Cleaner at Stop & Shop grocery stores in Attleboro, Massachusetts and Bristol and Newport, Rhode Island as well as Savers thrift stores in Woonsocket, Rhode Island and Framingham, Massachusetts from January 2015 until December 30, 2015." (Salazar Aff. ¶ 3, ECF No. 43-7.) Plaintiffs each attest that, during these periods, they believed that they worked for Roman's. (See Franco Aff. ¶ 8; Navarro Aff. ¶ 8; Salazar Aff. ¶ 11.) Plaintiffs stopped working at these stores because they were only compensated partially for their services[4] by Davi Souza, whom Roman's paid. (See Franco Aff. ¶¶ 4-7; Navarro Aff. ¶¶ 4-7; Salazar Aff. ¶¶ 4-10; Pls.' Deps. 6:16-7:5, 13-15, 22:17-20; Pls.' SDF ¶¶ 8, 11-12.)

Around the same time that Plaintiffs stopped working, Roman's lost the contracts to clean Stop & Shop and Savers stores because of the poor quality of Eagle's cleaning and the failure of Eagle's

---

[4] Franco and Navarro claim that they were each hired to work for $1,000 every two weeks, worked approximately forty-two hours per week, and were paid only $500 each for all of their work from September 2015 to December 24, 2015. (Franco Aff. ¶¶ 5-7; Navarro Aff. ¶¶ 5-7.) Salazar declares that he was hired to work for $1,400 every two weeks, worked approximately fifty-two hours per week, and was not paid for his overtime work between January 2015 and November 26, 2015 and for all work performed between November 27, and December 30, 2015. (Salazar Aff. ¶¶ 7-10.)

4

employees to report to the stores when scheduled, which Eagle failed to remedy after frequent complaints. (See, e.g., Boda Dep. 14:20–16:6; Skura Dep. 33:22–35:21; Drozdowski Dep. 89:8–91:19, 126:18–128:15; see generally Ex. J to Pls.' Obj. to Defs.' Mot. for Summ. J., ECF No. 43-12 (no-show emails); Ex. K to Pls.' Obj. to Defs' Mot. for Summ. J., ECF No. 43-13 (complaint emails).) Soon after, in May 2016, Eagle dissolved its business. (Business Entity Summ. 1.) Plaintiffs commenced the present action only days before Eagle's dissolution.

II. Legal Standard

Summary Judgment requires the Court to "tak[e] all the facts in the light most flattering to the nonmoving party, resolv[e] any evidentiary conflicts in that party's favor, and draw[] all reasonable inferences therefrom to his behoof." Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 396 (1st Cir. 2012) (citing Kuperman v. Wrenn, 645 F.3d 69, 73 (1st Cir. 2011)). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Packgen v. BP Expl., Inc., 754 F.3d 61, 66 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). In this context, however, the Court "will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'" Garmon v. Nat'l R.R. Passenger Corp., 844

F.3d 307, 312 (1st Cir. 2016) (quoting Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014)).

III. Discussion

Under the FLSA, an "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." Id. § 203(d). Furthermore, "employ" is defined as "to suffer or permit to work." Id. § 203(g). These definitions are to be construed broadly. See Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998). Moreover, the FLSA "contemplates several simultaneous employers, each responsible for compliance with the Act." Id. (citations omitted).[5]

"[T]o determine whether an employment relationship exists . . . courts look not to the common law conceptions of that relationship, but rather to the 'economic reality' of the totality of the circumstances bearing on whether the putative employee is economically dependent on the alleged employer." Id. (citing Aimable v. Long & Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994)). Four factors have emerged to test the "economic reality" of the circumstances: "whether the alleged employer (1) had the power to

---

[5] "Rhode Island law governing . . . wages is similar to the FLSA." Harbor Cruises LLC v. R.I. Dep't of Labor, No. P.C. 05-5076, 2008 WL 4961656, at *3 (R.I. Super. Ct. Nov. 10, 2008). The Court, therefore, does not separately address the RIMWA claim.

6

hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Id. (citing Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)). "The first two . . . factors address the extent of a putative employer's control over the nature and structure of the working relationship[,]" while the final two "address the extent of a putative employer's control over the economic aspects of the working relationship[.]" Id. at 675–76. However, "it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." Id. at 676.

A. Whether Roman's Had the Power To Hire and Fire Plaintiffs

At the outset, the record shows, and Plaintiffs seemingly concede that, neither Roman's nor Drozdowski ever hired[6] or fired

---

[6] Plaintiffs contend that Roman's hired Salazar prior to Eagle's incorporation. (Pls.' Mem. 14.) While Davi Souza hired Salazar before Eagle was incorporated (see Pls.' Deps. 21:21–22:6; Salazar Aff. ¶ 3; Business Entity Summ. 1), Salazar's own averments conflict as to whether he was hired by, or was an employee of, Roman's before Eagle's incorporation. (Pls.' Dep. 22:2 ("Yes. [Davi Souza] called me, there was job with Roman."); Salazar Aff. ¶ 11 ("I believe I worked for . . . Roman's."); id. ¶ 12 ("Davi hired me to work for Roman's.); id. ¶ 13 ("I believe that Davi worked for Roman's.")). Even assuming arguendo that Plaintiffs' suggestion is true, Plaintiff Salazar's own belief that he was hired prior to Eagle's formation – a proposition that is questionable at best based on the record – does not suffice to create a triable issue on the critical inquiry of who had the power to hire and fire Plaintiffs from Eagle. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a

7

Plaintiffs. (Pls.' Deps. 7:16–8:1, 10:13–14, 22:5–6; Drozdowski Dep. 65:23–66:24 (testifying that he never hired Plaintiffs); (see also Pls.' Mem. of L. in Opp'n to Defs.' Mot. for Summ. J. 14 ("Pls.' Mem."), ECF No. 43-2 ("[W]hile it may not be disputed that Defendant Drozdowski did not, himself, personally and directly hire or fire the three Plaintiffs . . . .")). Plaintiffs, however, contend that the "relevant legal test" is whether "Roman's actions, in 'the economic reality of the totality of the circumstances,' amount to an exercise of indirect, joint authority with and through [Davi Souza] over the Plaintiffs to initiate and terminate their employment." (Pls.' Mem. 14.) Plaintiffs argue that this is so because Eagle was not an independent economic entity, but instead entirely relied on Roman's for work and payment, which bestows upon Roman's – and not Eagle - the power to initiate and terminate the employment relationship by Roman's "ability to create and sustain cleaning contracts" with its customers. (Id. at 14–15.) Plaintiffs' only factual support for this economic dependence is that Plaintiffs were not paid unless Salazar picked up the check

---

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). And, in any event, the power to hire and fire is but one factor to test the "economic reality" of the totality of circumstances; a possible question of fact on this factor alone is not enough to send this case to a jury.

from Roman's to Eagle and delivered this check to Davi Souza.[7] (Id. at 15.)

Even assuming that Salazar had to pick up every check that Roman's wrote to Eagle for payment of Eagle's services, and that these payments were Eagle's only funding source, Eagle's dependence on Roman's as its only income source says nothing about Roman's authority to hire or fire Plaintiffs. Plaintiffs' argument, in essence, goes to whether Plaintiffs worked "exclusively or predominately" for the putative joint employer, which is one of six additional factors to determine joint-employer status articulated by the Second Circuit in Zheng v. Liberty Apparel Co., 355 F.3d 61, 75 (2d Cir. 2003).[8] This factor "weigh[s] in favor of joint employment if a subcontractor worked solely for a single client but had the ability to seek out other clients at any time." Id. at 75 n.12. However, the record lacks evidence, and Plaintiffs point to no such facts, to support that Eagle worked

---

[7] The record does not support that Plaintiffs were only paid if Salazar first picked up the check. (See, e.g., Pls.' SDF ¶ 11; Pls.' Deps. 6:16–7:5, 12:1–13:3, 22:17–20.) Moreover, it is not apparent – nor do Plaintiffs explain – how the method of delivering payment has any effect on Roman's ability to hire or fire Plaintiffs, or, as Plaintiffs argue, renders Eagle economically dependent on Roman's.

[8] The Second Circuit in Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003) derived these six additional factors from Rutherford Food Corp. v. McComb, 331 U.S. 722, 724–25 (1947).

9

solely for Roman's.[9]  (See Pls.' Mem. 14–15.)  Accordingly, Plaintiffs have not produced evidence that Roman's or Drozdowski could hire or fire Plaintiffs.[10]

> B. Whether Roman's Supervised and Controlled Plaintiffs' Work Schedules or Employment Conditions

"[S]upervision and control is probative of an employment relationship only when the oversight demonstrates effective control over the schedule and conditions of employment." Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 690 (D. Md. 2010) (citing Rutherford, 331 U.S. 772).  Generally, a joint-employment relationship requires the putative joint employer to control the day-to-day aspects of the putative employee, but "[t]he nature of the control distinguishes employment and contractor relationships[,]" even if there is a high level of control and supervision.  See id. at 690–91; cf. Baystate, 163 F.3d at 676

---

[9] Although it appears that the First Circuit has not adopted the six additional Zheng factors, the Court discusses them to the extent that they are referenced by the parties or are otherwise useful to the Court's analysis.  However, reference to the Zheng factors only bolsters the conclusion that summary judgment is appropriate for Defendants.

[10] Plaintiffs argue that Roman's has the authority to fire Plaintiffs because the Master Cleaning Services Agreement empowers it to notify Eagle that a worker is unqualified, whom Eagle must then remove from the job.  (See Master Cleaning Services Agreement ¶ 2H.)  However, such "deauthorization" of an Eagle employee is not tantamount to Roman's firing the employee from Eagle because it does not prevent that "deauthorized" Eagle employee from working for Eagle altogether.  See Jean-Louis v. Metro. Cable Commc'ns, Inc., 838 F. Supp. 2d 111, 124 (S.D.N.Y. 2011).

10

("An employer does not need to look over his workers' shoulders every day in order to exercise control." (quoting Brock v. Superior Care, Inc., 840 F.2d 1054, 1060 (2d Cir. 1988)). "[S]upervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." Jean-Louis, 838 F. Supp. 2d at 126 (quoting Zheng, 355 F.3d at 75).

Roman's control and supervision of Plaintiffs consisted of Roman's receiving reports and complaints of when Eagle employees arrived at and left the stores, or were absent from work,[11] and when Eagle's cleaning fell below the store's standards. (See, e.g., Drozdowski Dep. 89:3-15, 106:5-20; Boda Dep. 19:12-21:6; Skura Dep. 19:23-20:14, 24:17-25:6.) These time reports and customer complaints led Roman's supervisors to follow-up with Davi Souza (but never any of his employees)[12] to instruct him to correct

---

[11] At the Stop & Shop stores, Plaintiffs were required to call into an automated system upon their arrival and departure from the stores; this system generated automatic email reports to Roman's detailing the times that Plaintiffs arrived and departed the stores and/or if Plaintiffs were absent. (See, e.g., Drozdowski Dep. 77:11-21, 79:3-21; Skura Dep. 17:22-18:5.) Roman's informed Eagle about this system. (Drozdowski Dep. 105:2-13; Pls.' Deps. 8:6-11.)

[12] Navarro testified that he had contact with an unnamed Roman's supervisor, who was at the store to see that the job was done correctly; he also testified that the supervisor said he would look into what was going on with the checks after Navarro told him that he was not getting paid by Davi Souza. (Pls.' Deps. 14:10-

any deficiencies. (See, e.g., Drozdowski Dep. 91:4-9, 93:12-14, 109:9-110:13; Boda Dep. 21:7-14; Skura Dep. 19:23-20:14, 23:9-15, 33:22-35:21.) Roman's, its supervisors, and Drozdowski never dictated to Davi Souza or Plaintiffs what Plaintiffs' schedule was to be or how to perform the agreed-upon cleaning tasks. (See Drozdowski Dep. 87:16-89:2, 112:14-113:5; Boda Dep. 13:19-22, 18:5-19:11; Skura Dep. 13:3-23.) Even assuming that Roman's supervised and controlled Plaintiffs' work schedules or employment conditions to a high degree - a proposition unsupported by the record - Roman's supervision and control was entirely aimed at quality assurance (see Drozdowski Dep. 154:21-155:1; Boda Dep. 12:13-13:8; Skura Dep. 9:12-11:6, 12:4-13:2), which is substantively distinct from the control and supervision needed to form an employer-employee relationship. See Jean-Louis, 838 F. Supp. 2d at 126; see also Jacobson, 740 F. Supp. 2d at 690-92; Zampos v. W & E Commc'ns, Inc., 970 F. Supp. 2d 794, 804 (N.D. Ill. 2013) ("Quality control and compliance-monitoring that stem

---

19, 15:5-6, 14-22.) It was also his testimony that the supervisor spoke Spanish. (Id. at 15:5-6.) However, Andrzej Skura and Marian Boda both testified that they neither had any contact with Plaintiffs nor spoke Spanish. (Boda Dep. 21:11-14, 21:20-21; Skura Dep. 23:9-15, 41:18-21.) Assuming Navarro contacted a Roman's supervisor, the supervisor's presence at the store appears consistent with Roman's supervisors' routine, quality-control store checks. (See Boda Dep. 10:18-11; Skura Dep. 10:24-11:5,11:4-6, 12:10-14). But such quality control supervision does not establish Roman's as Plaintiffs' joint employer. See Jean-Louis, 838 F. Supp. 2d at 126.

from the nature of the business — that is, from the nature of the goods or services being delivered — are qualitatively different from control that stems from the nature of the relationship between the employees and the putative employer." (quoting Grenawalt v. AT & T Mobility, LLC, 937 F. Supp. 2d 438, 450-51 (S.D.N.Y. 2013))). At bottom, Plaintiffs have not produced sufficient evidence to demonstrate that Roman's exercised the requisite control and supervision over them to establish an employment relationship with Roman's.

C. Whether Roman's Determined the Rate and Method of Payment

It is undisputed that Roman's paid Eagle a set amount pursuant to their Master Cleaning Services Agreement. (See Drozdowski Dep. 133:9-15, 134:11-12; Boda Dep. 9:12-10:12; Master Cleaning Services Agreement ¶ 3(B); Statement of Services 1.) It is also undisputed that Davi Souza paid Plaintiffs. (Pls.' SDF ¶ 11; Pls.' Deps. 6:16-7:5, 12:1-13:3, 22:17-20). Further, there is no evidence that Roman's or Drozdowski paid Plaintiffs or dictated how Eagle should pay Plaintiffs. (See Drozdowski Dep. 151:18-152:4 (stating that he never told Davi Souza about Davi Souza's responsibility to pay Plaintiffs' wages).) Plaintiffs' emphasis that Roman's paid Eagle a set sum, with nothing more to demonstrate that Roman's controlled Plaintiffs pay, suggests nothing more than a typical, contractor-subcontractor relationship. See Jacobson, 740 F. Supp. 2d at 692 ("An employee's income, received from its

13

direct employer, will always be 'determine[d] and influence[d]' by what a contractor decides to pay the direct employer for services rendered by the employee." (citing Tafalla v. All Fla. Dialysis Servs., Inc., No. 07-80396-CIV, 2009 WL 151159, at *7 (S.D. Fl. Jan. 21, 2009)); (Pls.' Mem. 18.). Plaintiffs have otherwise produced no evidence to show that Roman's or Drozdowski had authority over the rate and method of Plaintiffs' payment.

D. Whether Roman's Maintained Employment Records

The record makes clear that Roman's maintained no employment records, such as "personnel files . . ., time sheets, pay stubs, or government employment forms[,]" for the individual Plaintiffs. Jean-Louis, 838 F. Supp. 2d at 130. The only records Roman's maintained, albeit on a temporary basis, were quality-of-work reports, customer complaints to Roman's about the quality of Eagle's cleaning and the tardiness or absence of employees, and the automatically generated emails from the call-in, timekeeping service at Stop & Shop stores that recorded Eagle employees' absences and time spent at the stores. (See Drozdowski Dep. 92:10-15; Boda Dep. 8:12-9:11, 16:8-24; Skura Dep. 14:19-24.) These records merely demonstrate that Roman's maintained records for quality-control purposes – a type of recordkeeping that does not suffice to show that Roman's controlled Plaintiffs' employment. See Jacobson, 740 F. Supp. 2d at 692 ("Plaintiffs have presented no evidence to indicate that the maintenance of this type of

14

information is used to control a technician's day to day employment, or that [the putative joint employer] retains records for any purpose beyond quality control."). The record is bereft of other evidence to suggest that Roman's maintained employment records for Plaintiffs sufficient to suggest control over them.

E. Whether There Are Additional Factors for Consideration

The only other <u>Zheng</u> factor that this Court considers (because both parties discuss it, (<u>see</u> Pls.' Mem. 2, 9; Defs.' Mem. 5)), relates to equipment, i.e., "whether a putative joint employer's . . . equipment [is] used by its putative joint employees." <u>Zheng</u>, 355 F.3d at 72. This factor may be "relevant because the shared use of . . . equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." <u>Zheng</u>, 355 F.3d at 72. While the record supports the inference that Roman's owned some equipment at the time that Plaintiffs had cleaned the stores of Roman's customers (<u>see</u> Ex. M to Pls.' Opp. to Defs.' Mot. for Summ. J., ECF No. 43-15), the evidence shows that Eagle used its own equipment at the job sites. (<u>See</u> Drozdowski Dep. 80:7-9, 105:17-21, 106:3-4; Skura Dep. 21:12-13, 28:6-29:3; Ex. L to Pls.' Opp. to Defs.' Mot. for Summ. J. 5, ECF No. 43-14.) Plaintiffs have not cited any evidence that they used Roman's equipment to clean.

F.  Whether the Economic Reality of the Totality of the Circumstances Renders Roman's Plaintiffs' Employer

In the end, Plaintiffs have not set forth sufficient evidence to defeat Defendants' Motion, either under the First Circuit's four-factor <u>Baystate</u> test, or the additional factors deemed relevant by other courts, to conclude that Roman's is Plaintiffs' joint-employer.  Instead, Plaintiffs simply supply "unsupported speculation" and "conclusory allegations" to propose that the "economic reality" of the totality of the circumstances raises a genuine issue of material fact.  <u>See</u> <u>Garmon</u>, 844 F.3d at 313.  It does not.  And no inference this Court could draw from this record rescues Plaintiffs from the conclusion that Roman's is not Plaintiffs' joint-employer within the meaning of the FLSA or RIMWA. <u>See</u> <u>Gomez</u>, 670 F.3d at 396.

IV. Conclusion

For the above reasons, Defendants' Motion is GRANTED.

IT IS SO ORDERED.

/s/ William E. Smith
_____
William E. Smith
Chief Judge
Date:  May 31, 2018